**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

    **vs.**

**DEREK LUCH,**

          **Defendant.**

**1:22-CR-130**
**(MAD)**

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **OFFICE OF THE UNITED STATES ATTORNEY** <br> 445 Broadway, Room 218 <br> Albany, New York 12207 <br> Attorney for the Government | **PAUL DEROHANNESIAN, AUSA** |
| **CRIMINAL CENTER LLC** <br> 1701 Pennsylvania Avenue Northwest, Suite 200 <br> Washington, D.C. 20006 <br> Attorney for Defendant | **BRANDON C. SAMPLE, ESQ.** |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On June 14, 2022, Defendant Derek Luch pled guilty to receipt and possession of child pornography. *See* Dkt. Nos. 16, 18. Five months later, the Court sentenced Defendant to seventy-eight months' imprisonment. *See* Dkt. No. 35. He filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on March 10, 2025, *see* Dkt. No. 42, which this Court denied on April 28, 2025, *see* Dkt. No. 48.

Now before the Court is Defendant's second motion for compassionate release, which he filed on April 7, 2026. *See* Dkt. No. 49. The Government opposed the motion on April 28, 2026.

1

*See* Dkt. No. 53. Defendant did not file a reply. As the Court noted in its 2025 Memorandum-Decision and Order, Defendant entered federal custody on November 4, 2021, and his anticipated release date is May 19, 2027. *See* Dkt. No. 48 at 2-3. On November 19, 2026, he will be eligible for home detention. *See id.* at 3.

For the following reasons, Defendant's second motion for compassionate release is denied.

## II. BACKGROUND

Defendant is now fifty-four years old, *see* Dkt. No. 32 at 2, and suffers from type two diabetes, respiratory issues, and neurological problems, including Parkinson's disease, *see* Dkt. No. 49-2 at 4-6. He is housed at Federal Medical Center Devens ("FMC Devens"), *see id.* at 2, which, as this Court previously noted, is "specifically designated for incarcerated individuals with serious medical conditions[,]" Dkt. No. 48 at 3.

For a summary of Defendant's health history prior to the 2025 motion, the parties are referred to the Court's Memorandum-Decision and Order dated April 28, 2025. *See* Dkt. No. 48. The Court denied Defendant's first motion for compassionate release because he failed to show that Parkinson's is a terminal illness, that his conditions could not be adequately treated while in custody, and that he could not care for himself. *See id.* at 9-13. The Court also determined that the factors in 18 U.S.C. § 3553(a) did not support an early release from custody. *See id.* at 14-16.

In his motion now before the Court, Defendant argues that "three materially new medical developments have occurred." Dkt. No. 49-2 at 1. First, the Bureau of Prisons ("BOP") elevated Defendant from Care Level 3 to Care Level 4, the BOP's highest medical classification, because of "his dependence on continuous supplemental oxygen." *Id.* Second, Defendant "was newly diagnosed with Type 2 diabetes mellitus, which is now uncontrolled[.]" *Id.* Finally, on August 27, 2025, Defendant was rushed to an outside hospital "for an acute neurological event . . .

characterized by aphasia, right-sided weakness, a blood pressure of 210/120, and findings prompting clinical concern for carotid artery dissection and TIA[.]" *Id.* at 1-2. Defendant characterizes himself as "wheelchair-bound" and "oxygen-dependent . . . with advancing Parkinson's disease[,]" *id.* at 4, claims that he experiences "respiratory decline" as "a direct consequence of his advancing neurological disease[,]" *id.* at 6, and insists that he is now unable to care for himself, *see id.* at 6-8. He also asserts that he experiences "multi-hour neurological episodes during which he develops aphasia, severe full-body shaking, and elevated blood pressure[,]" which diminish his ability to communicate and manage his medications. *Id.* at 7.

Before filing the instant motion, Defendant's attorney sent two messages to an administrative email address at FMC Devens regarding Defendant's medical conditions and the prospect of early release. Both emails were addressed to the warden. *See* Dkt. Nos. 49-3, 49-4. Counsel sent the first email on January 16, 2026 (the "January email"), and the second email on April 7, 2026 (the "April email"), the day Defendant filed his motion. *See* Dkt. Nos. 49-3, 49-4. On April 28, 2026, the warden determined that "[Defendant's] circumstances are not extraordinary or compelling[,]" Defendant is "independent with [his] activities of daily living[,] and FMC Devens is able to manage [his] medical needs at this time." Dkt. No. 54-1 at 1.

### III. DISCUSSION

**A.    Legal Standard**

A district court may reduce a defendant's sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A). The district court must consider the applicable factors set forth in 18 U.S.C. § 3553(a) and, if the defendant is under

seventy years old, may only reduce the sentence if it determines that "extraordinary and compelling reasons warrant such a reduction[.]" *Id.* "The moving defendant bears the burden of proving that 'extraordinary and compelling reasons' justify a reduction of his or her sentence." *United States v. Andrews*, 705 F. Supp. 3d 142, 147 (S.D.N.Y. 2023) (citing *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)) (other citation omitted).

**B.    Exhaustion**

The Government first argues that Defendant failed to exhaust his administrative remedies. *See* Dkt. No. 53 at 3, 8-9.  According to the Government, the January email is insufficient because it "does not specify any listed conditions besides [Defendant's] Parkinson's disease[.]" *Id.* at 9. The Government also argues that the April email is insufficient because Defendant did not wait thirty days before filing the instant motion in federal court. *See id.*  Because Defendant did not file a reply, he has not responded to the Government's exhaustion arguments.

As this Court explained in its earlier Memorandum-Decision and Order, a defendant may move for compassionate release after the earlier of two events: (1) exhaustion of administrative appeal rights if the BOP fails to file a motion on the defendant's behalf; or (2) the passage of thirty days since the warden received the defendant's request. *See* Dkt. No. 48 at 6 (quoting *United States v. Romano*, 707 F. Supp. 3d 233, 236 (E.D.N.Y. 2023)).  Courts in this circuit have taken different approaches to the second scenario. *See United States v. Saladino*, 7 F.4th 120, 123-24 (2d Cir. 2021).  Some courts permit a defendant "to file a motion only after he has 'waited 30 days from the Warden's receipt of his request for compassionate release *without receiving a response*.'" *Id.* (quoting *United States v. Samuels*, No. 08-CR-789-6, 2020 WL 7696004, *3 (S.D.N.Y. Dec. 28, 2020)).  Under this approach, if the warden responds to the request within thirty days, the individual must then satisfy the regular exhaustion procedure. *See id.* at 124 (quoting *Samuels*,

4

2020 WL 7696004, at *3).  Other courts "have held that the statute's 30-day waiting period authorizes the inmate's filing a motion regardless of whether the warden responds to the inmate's request for compassionate release."  *Id.*  Under that approach, the defendant may file his motion after the thirty days pass, regardless of the warden's action or inaction.  *See id.* (quoting *United States v. Haney*, 454 F. Supp. 3d 316, 321 (S.D.N.Y. 2020)).

The Second Circuit has not endorsed one approach over the other.  *See id.* at 124 & n.2.  However, at least one district court outside this Circuit has construed Second Circuit caselaw to support the first approach.  *See id.* at 124 n.2 (citing *United States v. Harris*, 505 F. Supp. 3d 1152, 1156 (D. Kan. 2020)) (other citation omitted).

This Court previously noted that the substance of the compassionate release motion and BOP request need not match exactly.  *See* Dkt. No. 48 at 6 (citing *United States v. McIntosh*, No. 12-CR-72, 2021 WL 1660682, *3 (S.D.N.Y. Apr. 28, 2021) (collecting cases); *United States v. Hasanoff*, No. 10-CR-162, 2020 WL 6285308, *3 n.1 (S.D.N.Y. Oct. 27, 2020)).  Notwithstanding, as this Court has also recognized, "'there must be a reasonable degree of overlap which gives the [Bureau of Prisons] a fair opportunity to consider whether to make the motion on the defendant's behalf.'"  *Id.* at 7 (quoting *United States v. Johnson*, 619 F. Supp. 3d 81, 88 (D.D.C. 2022)).

Defendant's January email refers only to his Parkinson's disease.  *See* Dkt. No. 49-3.  It states, in pertinent part:

> Mr. Luch suffers from Parkinson's disease (PD).  As a result of his PD, he is unable to care of himself [sic] appropriately, and his condition continues to worsen.  The facility is not providing him with appropriate care and his overall life expectancy is worsening by the day due to lack of necessary care.  Accordingly, I request that he released [sic] from the facility so he may return to his mother who currently lives in Vermont.

*Id.* The email does not discuss Defendant's diabetes, respiratory failure, mobility issues, or the August 2025 "neurological event." *See id.* However, as the Court highlighted in its 2025 Memorandum-Decision and Order, the BOP had prior notice of Defendant's respiratory problems and mobility limitations through a full review of his medical records. *See* Dkt. No. 48 at 7-8. Thus, consistent with its earlier decision, the Court considers Defendant's administrative remedies properly exhausted as to respiratory and mobility issues associated with Parkinson's disease.

The Government challenges the April email based on timing. Specifically, the Government argues that because Defendant filed the instant motion immediately after sending the April email to the warden, he failed to abide by the thirty-day statutory waiting period. *See* Dkt. No. 53 at 9. Consequently, the Government claims the BOP did not have enough time to consider the request before Defendant filed his compassionate release motion in federal court. *See id.* Although the April email specifically discusses Defendant's move to Care Level 4, "his dependence on continuous supplemental oxygen[,]" his newly acquired diabetes, the August 2025 neurological event, and his "chronic hypoxic respiratory failure . . . as a direct sequela of his advancing Parkinson's disease[,]" Dkt. No. 49-4 at 1, the email shares the same date as the compassionate release motion now before the Court, *see id.*; Dkt. No. 49-2. The record shows the warden responded unfavorably to the April email on April 28, 2026. *See* Dkt. No. 54-1 at 1.

Under the first approach to the thirty-day waiting period, discussed above, the warden's response would require Defendant to appeal the unfavorable determination before moving for compassionate release in federal court. *See Saladino*, 7 F.4th at 124 ("[I]f the BOP timely responds to the inmate's request for compassionate release, the inmate must satisfy the same exhaustion procedure that applies to routine administrative grievances, which would include

appeals to both the appropriate Regional Director and the BOP General Counsel") (citation, alteration, and internal quotation marks omitted).  Defendant does not claim to have appealed.  Under the second approach, Defendant's motion would fail for premature filing.  Because the April email fails to exhaust Defendant's administrative remedies under both approaches, the Court need not decide which approach is more appropriate.  They both lead to the same result: the April email does not satisfy the exhaustion requirement.

## C.    Merits

Even if Defendant fully exhausted his administrative remedies, his motion would still fail on the merits.

### 1. Extraordinary and Compelling Circumstances

Defendant argues that his elevation to Care Level 4, his new diabetes diagnosis, the August 2025 "neurological event" and associated symptoms, and his chronic Parkinson's-related respiratory problems "establish the extraordinary and compelling reasons the Court found lacking [in 2025] and directly answer the Court's dispositive self-care holding."  Dkt. No. 49-2 at 1-2.  The Government argues that "[n]one of [Defendant's] new conditions are 'terminal illnesses' or a serious medical condition that cannot be adequately treated within the BOP[,]" and Defendant can still care for himself while in BOP custody.  Dkt. No. 53 at 9-14.

The Sentencing Guidelines provide a list of circumstances that constitute, alone or in combination, extraordinary and compelling reasons for a sentence reduction or early release.  *See* U.S.S.G. § 1B1.13(b).  As is relevant here, the Sentencing Guidelines provide the following examples: (1) a terminal illness "with an end-of-life trajectory[,]" although "[a] specific prognosis of life expectancy . . . is not required"; (2) "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of

7

a correctional facility and from which he . . . is not expected to recover"; and (3) "a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id.* §§ 1.B1.13(b)(1)(A)-(C).

### a. Terminal Illness

The Court previously determined that Defendant's Parkinson's disease was not a terminal illness. *See* Dkt. No. 48 at 10-11. Defendant does not argue otherwise. He also does not show that his respiratory difficulties, even as a consequence of Parkinson's, constitute a terminal illness. The record indicates that Defendant receives continuous supplemental oxygen, *see* Dkt. No. 49-2 at 3; Dkt. No. 50 at 5 (noting in January 2026 that Defendant is a "[w]ell-developed male in no acute distress" who "ambulates via wheelchair with continuous O2 via nasal cannula"), but does not suggest that the respiratory issues have an "end-of-life trajectory[,]" U.S.S.G. § 1B1.13(b)(1)(A).

The same conclusion is warranted for Defendant's neurological issues associated with the August 2025 incident. Defendant characterizes the neurological episode as indicative of "a clinical trajectory materially more serious than the one before the Court" in 2025. Dkt. No. 49-2 at 5. He does not claim, or offer any legal authority to show, that his neurological condition is terminal.

The Court reaches the same result for Defendant's diabetes. Although courts in this Circuit reduced diabetic defendants' sentences during the COVID-19 pandemic because diabetes increased their susceptibility to the virus, *see, e.g.*, *United States v. Rountree*, 460 F. Supp. 3d 224, 234-36 (N.D.N.Y. 2020); *United States v. Resnick*, 451 F. Supp. 3d 262, 269-71 (S.D.N.Y. 2020); *United States v. Rivera*, 466 F. Supp. 3d 310, 315-18 (D. Conn. 2020), Defendant has not

mentioned coronavirus susceptibility or cited any authority showing that diabetes is a terminal illness, *see United States v. Stevens*, 459 F. Supp. 3d 478, 484-85 (W.D.N.Y. 2020) ("Even assuming that Stevens is an insulin-dependent diabetic with attendant neuropathic pain, his condition is not a terminal illness . . ."). While Defendant emphasizes that his diabetes is uncontrolled, he admits being "noncompliant with his prescribed [medication] and declin[ing] alternative medications." Dkt. No. 49-2 at 4 (citing Dkt. No. 50 at 4-5). His medical records also show "noncompliance with diet." Dkt. No. 50 at 4. Ultimately, Defendant has not established that his diabetes is a terminal illness.

### b.  *Self-Care and Medical Attention in BOP Custody*

Defendant likewise fails to show that his medical conditions are so serious that they prevent self-care or are not being properly treated while Defendant is in BOP custody. Although he argues that his elevation from Care Level 3 to Care Level 4 suggests the BOP can no longer handle his medical care, *see* Dkt. No. 49-2 at 3-4, the Court rejects that contention. Defendant's elevation to Care Level 4 does suggest increased healthcare needs, but it in no way indicates that the BOP cannot provide Defendant's necessary care. Rather, the availability of Care Level 4 suggests the BOP *is* equipped to address Defendant's needs while he is in custody. Defendant similarly argues that because the BOP has referred him for outside sleep studies and neurosurgical consultations, "his conditions have progressed beyond what can be managed within the institution." *Id.* at 6. He does not explain this conclusion any further.

As for self-care, Defendant claims that his continuous oxygen dependence prevents him from engaging in daily life activities, and "[r]ecurrent acute neurological episodes with aphasia" prevent him from managing his medications and calling for help. *Id.* at 7. He also claims that discontinued physical therapy and his admitted noncompliance with diabetes treatment show the

BOP can no longer provide adequate care.  *See id.* at 7-8.  The Government counterargues that Defendant receives ample medical attention at FMC Devens.  *See* Dkt. No. 53 at 12-13.

Defendant's ongoing medical monitoring refutes his claims that the BOP cannot manage his conditions and that he cannot care for himself.  Defendant's medical records show he has regular visits with healthcare providers, including for neurological symptoms and respiratory issues.  *See, e.g.*, Dkt. No. 50 at 28-29 (discussing a clinical encounter in October 2025 where Defendant was given prescribed medication for head shaking, arm shaking, and stuttering, then "returned to housing unit in stable condition"); Dkt. No. 52 at 21-22 (discussing a clinical encounter in March 2026 where Defendant was evaluated for "involuntary movements in the right upper extremity and difficulty in communicating verbally," and stating that "[t]he tremor movements resolved on their own"), 29 (noting that Defendant "ambulate[d] via wheelchair with attached O2 tank" in March 2026).  Records from March 2026 show Defendant successfully used a "reacher" to help him pick up items, such as a shampoo bottle.  Dkt. No. 52 at 84.  At that time, Defendant "report[ed] no difficulty with showering/bathing routine."  *Id.*  Healthcare providers worked with Defendant on communication strategies in case of speech difficulties.  *See id.* Although Defendant no longer receives physical therapy, medical records show that he expressed a "desire to not partake in progressing mobility towards walking[.]"  Dkt. No. 50 at 96.  The records do not show that FMC Devens is unable to provide physical therapy and similar care.

Even if Defendant's medical conditions were sufficiently serious, as defined in the Sentencing Guidelines, he has not shown an inability to care for himself.  He also fails to show that the BOP can no longer provide for his care.  Thus, the Court finds that Defendant has not established extraordinary and compelling circumstances warranting early release.

### 2.  *18 U.S.C. § 3553(a) Factors*

Finally, as the Court noted in its earlier Memorandum-Decision and Order, it must consider the factors set out in 18 U.S.C. § 3553(a):

> (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; and (3) the need for the sentence imposed to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Dkt. No. 48 at 14 (citing 18 U.S.C. §§ 3553(a), 3582(c)). The Court previously found that the § 3553(a) factors weighed against early release, noting the nature of Defendant's crimes and his risk of reoffending. *See id.* at 14-16.

In relation to the factors, Defendant again argues that elevation to Care Level 4 and referral for outside consultation mean the BOP cannot provide the care he needs. *See* Dkt. No. 49-2 at 8. Defendant contends that "[t]he recurrent neurological events, uncontrolled diabetes, and confirmed chronic hypoxic respiratory failure as a Parkinson's sequela all require a level of continuous, coordinated, specialized care that a correctional environment is structurally unable to provide." *Id.* He claims that, "[i]f released to his mother's home in Vermont, [he] will have access to the specialized Parkinson's, pulmonary, endocrinology, and neurosurgical care his condition now requires." *Id.* In opposition, the Government recognizes Defendant's lack of specific care plan. The Government points out that Defendant "provides no additional information to justify how or why he would have that specialized care in Vermont, especially when he was considered indigent with no assets or ability to pay a fine at the time of sentencing." Dkt. No. 53 at 17. The Court agrees with the Government for the reasons already discussed;

11

Defendant simply has not shown why his continuous medical attention at FMC Devens, a facility specifically equipped to house individuals with advanced medical needs, is inadequate.

Finally, Defendant argues that his "continuous oxygen dependence, recurrent multi-hour aphasia episodes, uncontrolled diabetes, and Care Level 4 status[,]" combined with mandatory post-release supervision conditions, "meaningfully limit[]" his ability to reoffend. Dkt. No. 49-2 at 9. Defendant's offense conduct included possessing hundreds of child pornography images and thousands of anime cartoons showing "sadistic and masochistic conduct" involving children. Dkt. No. 48 at 2. The Government argues, and the Court previously acknowledged, that this conduct does not require much physical mobility. *See* Dkt. No. 53 at 14; Dkt. No. 48 at 14-15. That remains true now, and in addition, Defendant has not shown why diabetes, aphasia episodes, or use of oxygen would prevent him from accessing child pornography. The Court also agrees with the Government, as it did when considering Defendant's previous motion, that Defendant has not demonstrated remorse or rehabilitative efforts.[1] *See* Dkt. No. 53 at 16; Dkt. No. 48 at 15.

Prior to sentencing, Defendant expressed an attraction to "pre-pubescent boys since he was about age twelve" and admitted to viewing child pornography since then. Dkt. No. 32 at ¶ 14. According to the pre-sentence investigation report, "[h]e knew what he was doing was illegal." *Id.* During a polygraph exam, Defendant admitted he is sexually attracted to boys as young as twelve. *See id.* at ¶ 15. As the Court previously emphasized, "[t]hat Defendant was not convicted of a hands-on offense does not diminish the seriousness of his crimes." Dkt. No. 48 at 15. Recognizing the risk that Defendant poses to the community, the Court finds that the § 3553(a) factors still weigh against early release.

---

[1] Although Defendant's program review discusses a recommended "Victim Impact" course, to be completed by May 2026, and a "Sex Offender Treatment" program, to be completed by the end of 2026, Defendant does not reference these programs in his motion. Dkt. No. 53-1 at 3.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated above, the Court hereby

**ORDERS** that Defendant's second motion for compassionate release (Dkt. No. 49) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  June 22, 2026
        Albany, New York

Mae A. D'Agostino
U.S. District Judge